**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HERSHEY SPRINGS FARM, LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-03751-JLS |
| | : | |
| THE CROWN HEIGHTS MEAT STORE, INC., | : | |
| *et al.*, | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

**SCHMEHL, J. -** */s/ JLS*                                                 **MARCH 11, 2026**

Plaintiff brought this action under the Packers and Stockyards Act, 7 U.S.C. §228b, claiming the Defendants failed to pay Plaintiff for the delivery of livestock. Plaintiffs have also asserted state claims for breach of contract, fraud, unjust enrichment, promissory estoppel, conversion, tortious interference with contractual relationship and piercing the corporate veil. Plaintiff seeks damages in the amount of $276,540.57. Presently before the Court is the Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is denied.[1]

**STANDARD OF REVIEW**

---

[1] In its response to Defendants' motion to dismiss, Plaintiff claims the following procedural events occurred: "Plaintiff filed a Complaint regarding this matter on September 27, 2023. (Doc. 1). Though the Defendants refused to accept service of the Complaint, the parties began negotiating a settlement agreement and consent judgment regarding this dispute and appeared to come to an agreement. Thereafter, however, Defendants stopped communicating with Plaintiff and refused to sign the settlement agreement, compelling Plaintiff to file an Amended Complaint (Doc. 5) on March 21, 2025. Plaintiffs had to attempt service using multiple process servers because Defendants continually and intentionally evaded service. Plaintiff served defendants CH Butcher, Crown Heights, and Levi Kabakov on April 7, 2025. See Docs. 7-9. Defendants Meir Kabakov and Pasific Halal agreed to waive service and the Plaintiff sent them a waiver form on April 28, 2025. See Docs. 10-11. Defendants filed a Motion to Dismiss for lack of personal jurisdiction on June 27, 2025." ECF 13-2, p. 2.

A Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction "is inherently a matter which requires resolution of factual issues outside the pleadings." *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603 (3d Cir. 1990). The "plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)). In responding to the defendant's Rule 12(b)(2) motion, the plaintiff need not "rely on the bare pleadings alone...." *International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines*, 673 F.2d 700 (3d Cir. 1982). Courts reviewing a motion to dismiss for lack of personal jurisdiction "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992); *Pinker*, 292 F.3d at 368.

The AC alleges that Plaintiff is a livestock farmer located in Lancaster County, Pennsylvania. ECF 5 at ¶¶ 6,13. Defendants The Crown Heights Meat Store, Inc. ("Crown Heights"), Pasific Halal Meat Corp. ("Pasific") and CH Butcher Inc. ("Butcher") are New York corporations with registered addresses in Brooklyn, New York. *Id*. at  ¶¶ 7-9. Individual Defendants Meir Kabakov ("Meir"), Levi Yitzchak Kabakov ("Levi") and Benjamin Kabakov ("Benjamin") are alleged to be Brooklyn residents and owners, members, managers, shareholders, officers, directors, employees and or agents of Crown Heights, Pasific and Butcher. *Id*. at ¶¶ 10-12.

The Plaintiff alleges that Defendants "started ordering livestock from Plaintiff on or around May 3, 2021, and on a weekly basis thereafter." *Id*. at ¶ 15. According to Plaintiff, "Plaintiff and Defendants developed a course of performance and course of dealing for the sale of

**2**

livestock by Plaintiff to Defendants for processing and sale through Defendant's kosher meat markets and delicatessens." *Id*. at ¶ 16.

On June 29, 2022, July 6, 2022, July 14, 2022, July 19, 2022 and July 26, 2022, Defendants ordered various livestock from Plaintiff. *Id*. at ¶¶ 17-21. This livestock was delivered to and accepted by the Defendants. *Id*. at ¶ 23. Despite all of the invoices for the livestock being marked "Due on receipt," Defendants failed to pay for the livestock they received. *Id*. at ¶ 26.

The AC alleges that Defendants Meir, Levi and Benjamin are the alter ego of Crown Heights, Pasific and Butcher, *id*. at ¶¶ 29-47, and that all of the Defendants are engaged in a joint venture. *Id*. at ¶¶ 48-53.

**PERSONAL JURISDICTION**

"A federal district court may assert personal jurisdiction over a nonresident of a state in which the court sits to the extent authorized by the law of that state." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir. 1987) (citing Fed. R. Civ. P. 4(e)). This Court sits in Pennsylvania, which permits jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S. § 5322(b); see also *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd*., 566 F.3d 94, 102 (3d Cir. 2009). Therefore, to determine whether personal jurisdiction can be exercised over Defendants, the Court must evaluate whether, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants have "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *D'Jamoos*, 566 F.3d at 102 (quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, (1945)).

There are two types of personal jurisdiction: general and specific. *Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 414 (1984). General jurisdiction exists where the defendant has contacts with the forum state that "are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted)). General jurisdiction does not require the underlying cause of action to be related to the defendant's activities in the state. Plaintiff does not contend that the Court has general jurisdiction over the Defendants.

On the other hand, a court has specific jurisdiction if "a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, (1985)). "Because this analysis depends on the relationship between the claims and contacts, [courts] generally evaluate specific jurisdiction on a claim-by-claim basis." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007).

Generally, a district court analyzing its specific jurisdiction over a particular claim must conduct a three-part inquiry. *Marten*, 499 F.3d at 296. First, the court asks whether the defendant "purposefully directed his activities at the forum." *Id*. (internal citation omitted). Second, the court determines whether the plaintiff's claim "arise[s] out of or relate[s] to at least one of those specific activities." *Id*. (internal citation omitted). Third, and finally, "courts may consider additional factors to ensure that the assertion of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id*. (internal citation omitted).

"It is not significant that one or the other party initiated the relationship. (citation omitted).  In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration." *Gen. Elec. Co.,* 270 F.3d at 151.

**DISCUSSION**

The parties have filed affidavits in support of their positions. Since the Plaintiff does not contend that the Court has general jurisdiction over the Defendants, the Court will cite only to the averments addressing specific jurisdiction.

In an affidavit attached to the motion to dismiss, Benjamin avers that "on behalf of Pasific" he has "purchased livestock and related products from the Plaintiff." ECF 12-5 at ¶ 1d. He also avers that he has "traveled to Pennsylvania for business purposes, 1-2 times in my life to conduct a site visit to Plaintiff's property." *Id*. at ¶ 2a. He avers that it was Plaintiff that initiated communications with the Defendants to sell livestock to Defendants. *Id*. at ¶¶ 4a, 6b. According to Benjamin, he has had "business-related telephone calls with the Plaintiff or a Plaintiff-associated party only in New York." *Id*. at ¶ 6a. Benjamin avers that he and Pasific "are not involved in any joint venture with any of the other named Defendants, nor does it employ any of the other named Defendants." *Id*. at ¶ 1e. Finally, Benjamin avers that neither he nor Pasific ever "direct, manage, control any part of the business operation for any of the other named Defendants." *Id*. at ¶ 1f.

Meir avers that he had no telephone calls, emails, letters, or business discussions with the Plaintiff or any Plaintiff-associated party in Pennsylvania. ECF 12-3 at ¶ 6a. He avers that he has taken no purposeful action to avail himself of Pennsylvania law or market and that he has no ties at all to Pennsylvania. *Id*. at ¶ 7a.  Meir avers that he does not "own any shares in Defendants

**5**

The Crown Heights Meat Store, Inc., Pasific Halal Meat Corp. and or CH Butcher, Inc. or have any business interests in or affiliation" with those entities. *Id*. at ¶ 3b.

Levi, Crown Heights and Butcher aver that they "have not and have never purchased livestock or any other product from Plaintiff." ECF 12-4 at ¶ 1e. They aver that "they have had no telephone calls, emails, letters, or business discussions with the Plaintiff or any Plaintiff-associated party in Pennsylvania." *Id*. at ¶ 6e. They further aver that they have taken no purposeful action to avail [themselves] of Pennsylvania law or market. *Id*. at ¶ 7a. They further aver that they "are not involved in any joint venture with any of the other named Defendants, nor does it employ any of the other named Defendants, at any time relevant to the claims in Plaintiff's Amended Complaint." *Id*. at ¶ 1f. According to moving Defendants, they "did not direct, manage, or control any part of the business operation for any of the other named Defendants at any time relevant to the claims in Plaintiff's Amended Complaint." *Id*. at ¶ 1g. Finally, the moving Defendants aver that they "do not own any shares in Defendant, Pasific Halal Meat Corp., or have any ownership interests in Defendant Pasific Halal Meat Corp." *Id*. at ¶ 3b.

In an unrefuted affidavit, Seth Hershey ("Hershey"), the manager/member of Plaintiff, avers that he "is the contact person for livestock sales and was the one who spoke with the Defendants in this case regarding all of their livestock orders." ECF 13-1 at ¶ 4.

According to Hershey, in May of 2021, Benjamin texted Hershey his email address so that Hershey could send him invoices for the purchased livestock. *Id*. at ¶ 5. Hershey avers that during the course of the parties' relationship, he interacted with all of the named Defendants "throughout the course of dealing and course of performance, using a combination of voice, text and/or email communications." *Id*. at ¶¶ 6, 24. According to Hershey, "Defendants ordered livestock from [Plaintiff] nearly every week for approximately fourteen (14) consecutive months."

**6**

*Id*. at ¶ 7. Plaintiff would transport the purchased livestock from Pennsylvania to New York. *Id*. at ¶ 8. Defendants accepted each delivery of livestock. *Id*. at ¶ 9. Until the end of June, 2022, Defendants paid for the livestock via wire transfer, PayPal, Venmo and paper checks mailed to Plaintiff in Pennsylvania. *Id.* at ¶ 11. Hershey avers that "[i]n June of 2022, Defendants continued to order livestock but stopped paying their invoices in July of that year." *Id*. at ¶ 12.  Hershey "spoke with Benjamin generally once a week, sometimes every other week" and spoke with Levi "towards the end of doing business with them." *Id*. at ¶ 13. Per Hershey, "Defendants promised to make payment for their past due invoices multiple times when corresponding via text message." *Id*. Hershey avers that "[b]ased on these promises, [Plaintiff] continued to ship livestock to Defendants." *Id*. at ¶ 14. However, Plaintiff stopped sending livestock to Defendants after Defendants failed to make payment on the July 26, 2022 invoice. *Id*. at ¶ 15.

Hershey further avers that Benjamin, along with two employees of CH Butcher visited Plaintiff on at least two occasions in or around January 2021 to inspect livestock. *Id*. at ¶ 10. During the second visit, Defendants requested that a "large animal veterinarian be present to perform ultrasounds on [the] cattle to assist Defendants in determining whether the cattle was kosher." *Id*.

Hershey avers that Benjamin contacted him when he needed more beef and that Hershey contacted Benjamin to see if he needed any cattle. *Id*. at ¶ 16. Hershey "mostly corresponded with Benjamin Kabakov but the brothers were involved because they would send [Hershey] payment at times." *Id*.

Hershey avers that "[e]ach of the Kabakovs are believed to have ownership in Crown Heights" as it is a family business that was started by Meir Kabakov. *Id*. at ¶ 17.  Benjamin was the buyer of the meat for the Defendant entities which is why Hershey primarily

communicated with him. *Id*. In a text message exchange, Benjamin indicated to Hershey that Defendants Crown Heights, Pasific Halal and CH Butcher "are all part of the same group of entities owned by the Kabakovs." *Id*. at ¶ 18. S*ee* February 28, 2022 text message from Benjamin Kabakov to Seth Hershey. ECF 13-1, p. 14. ("[Pasific Halal] is *our* non Kosher Buisiness [sic] name.") (emphasis added.) Hershey further avers that "Benjamin, Levi and Meir Kabakov are all believed to be owners of these entities, and all exercised control over the finances of the Defendant entities.") *Id*. at ¶ 19. Hershey avers that "Benjamin frequently had to check with his brother regarding payment for the cattle." *Id*.; May 1, 2023 text message from Benjamin Kabakov to Seth Hershey ("I'll ask my brother.") According to Hershey, "Meir and Levi Kabakov had control over the Defendant entities, as they are believed to have cut Benjamin out of the joint venture. *Id*. at 20. *See* June 2023 text message from Benjamin Kabakov to Seth Hershey. ECF 13-1, p. 20 ("I don't have [money] now, *they* took me out of the picture and I don't have no where [sic] to pull out money, you know *they* tried paying you something but after the big loss in MN *they* got caught up in another situation. Don't think *they* have anything bad but need more time to recover . . . if you want to help *them* recover back to Buisiness [sic] *they* might pay you one day if you try to putt [sic] *them* down, don't think it will help you.") (emphasis added.) Per Hershey, Plaintiff "received payment from Crown Heights and Benjamin's brother." *Id*. at ¶ 21. *See* December 10, 2021 text message from Benjamin Kabakov to Seth Hershey, ECF 13-1, p. 10 ("my brother sent you 30K today. . . "); *see* December 19, 2021 text message from Benjamin Kabakov to Seth Hershey, ECF 13-1, p. 11 ("if you want to send me back that 25 I'II have my brother wire it to you tomorrow with the rest.") In response to Plaintiff's repeated demands for past due invoices, "Defendants claimed they signed papers for a SBA loan and were waiting for the funds to come through." *Id*. at ¶ 22.  *See* August 22, 2022 text message from Benjamin Kabakov to Seth Hershey, ECF 13-1,

p. 17 ("my brother finished signing all the docs for the SBA loan, now we're just waiting for the bank to fund it, hopefully very soon."). Per Hershey, he later learned the loan was denied. *Id*.

Although Plaintiff may have initiated the relationship with Defendants, it was the Defendants who chose to pursue a course of dealing with the Plaintiff on a nearly weekly basis for more than a year. For over 12 months, Defendants, through Benjamin, purposely purchased livestock from Plaintiff, a Pennsylvania corporation and continued the relationship by communicating with, and sending payments, to Plaintiff in Pennsylvania. The AC alleges that Defendant Benjamin along with two representatives from Butcher made two physical appearances in Pennsylvania in or about January, 2021 to inspect Plaintiff's livestock. It was the Defendants' alleged failure to make payments for the livestock which resulted in this suit. Having taken part in a continual course of dealing with Plaintiffs in Pennsylvania over a 12-month period, the Defendants had clear notice that they would be subject to suit there.

In addition, the contents of the text messages exchanged between Hershey and Benjamin reveal that there was a much more intricate business relationship among the Defendants than they averred in their affidavits. As a result, the Court finds that all of the Defendants played a role in the events giving rise to this action.

In short, the actions of the Defendants clearly amount to "purposeful direction" of business activity toward Plaintiff, a Pennsylvania resident. It is also beyond dispute that this suit arose out of the Defendants' alleged refusal to pay for numerous invoices sent to them by the Plaintiff. Finally, given the proximity of Pennsylvania to New York, the interest Pennsylvania has in resolving a dispute causing financial harm to one of its businesses and the interest that Plaintiff, as a Pennsylvania resident, has in obtaining relief in Pennsylvania, Pennsylvania's assertion of personal jurisdiction over the Defendants is clearly neither unfair nor unreasonable.

**9**